**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITES STATES OF AMERICA | ) | |
| | ) | |
| -v- | ) | Criminal No. 4:10 CR 21 |
| | ) | |
| PAUL POGUE | ) | |

# SENTENCING MEMORANDUM ON BEHALF OF PAUL POGUE

**Attorneys for the Defendant**
Michael E. McCue
Michael A. Villa, Jr.
Stephanie D. Mongiello
**MEADOWS, COLLIER, REED,**
**COUSINS, CROUCH & UNGERMAN, L.L.P.**
901 Main Street, Suite 3700
Dallas, Texas 75202-3792
214.744.3700 *Phone*
214.7473732 *Fax*

# TABLE OF CONTENTS


Page

I. INTRODUCTION ........ 1

II. THE OFFENSE ........ 4

III. PAUL POGUE'S PERSONAL HISTORY AND CHARACTERISTICS ........ 5

A. Pogue's Long History of Charitable Acts and Good Works ........ 7

B. Paul Pogue's Professional History ........ 9

IV. PRESENTENCE REPORT ........ 10

V. FACTORS UNDER 18 U.S.C. §3553(a) ........ 10

1. Nature of the Offense and History and Characteristics of Mr. Pogue ........ 11

(a) History and Characteristics of Mr. Pogue ........ 11

(b) Nature of the Offense ........ 12

2. The Need for the Sentence Imposed ........ 12

(a) Retribution ........ 13

(b) General Deterrence ........ 13

(c) Specific Deterrence and Rehabilitation ........ 13

3. The Kinds of Sentences Available ........ 14

4. & 5. The Sentencing Guidelines and Policy Statements ........ 14

6. Disparity with Similar Offenders ........ 16

7. Restitution ........ 17

VI. SENTENCING RECOMMENDATIONS ........ 17

A. Community Service ........ 17

B. Home Confinement ........ 19

VII. CONCLUSION ........ 20

APPENDIX 1:

A. List of Mr. Pogues's Charitable Works

B. List of Mr. Pogue's Planned Mission Trips

C. Picture of Pogue Family

D. Materials and Pictures Regarding Christ for India

E. Materials and Pictures Regarding Mexico Ministries

F. Materials and Pictures Regarding Mundo De Fe (World of Faith)

G. Materials and Pictures Regarding African Missions

H. Materials and Pictures Regarding Grace Flights

I. Deposits to Internal Revenue Service

J. U.S. Sentencing Commissions Report for 2009

K. Letters of Recommendation

**APPENDIX 2:**

**Community Service Proposal for Paul Pogue**

A. 3e McKinney

B. Project Timeline

C. ManeGait

D. Samaritan Inn

E. McKinney Housing Authority

F. Timesheets

## I. INTRODUCTION

Mr. Pogue respectfully submits that a sentence of probation, combined with community service as a condition of probation, is "sufficient but not greater than necessary" as punishment pursuant to 18 U.S.C. § 3553(a). After *United States v. Booker*, district courts must consider the factors outlined in 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in § 3553(a)(2). *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *United States v. Booker*, 543 U.S. 220, 245 (2005).

In *Gall*, the Supreme Court stated that a district court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. Furthermore, the Court rejected the idea that "extraordinary circumstances" are required to justify a sentence outside of the Guidelines sentence range. *Id.* at 47. Finally, the Court rejected the use of rigid mathematical formulas to determine whether a variance from the Guidelines sentence range is justified. *Id.*

As a result, previously prohibited factors, such as family ties and the particular aspects of a defendant's character and good works, must now be considered. *See Gall*, 552 U.S. at 43-44, 60 (affirming a sentence of probation where Guidelines sentence range was 30 to 37 months imprisonment and where sentencing judge based variance on defendant's post-offense conduct and personal characteristics, including getting a college degree, starting a successful business, support of family and friends, and lack of criminal history); *Kimbrough*, 552 U.S. at 110 (affirming a significant downward variance from Guidelines sentence range where sentencing judge based variance on defendant's service in and honorable discharge from the Marines, steady employment history, and lack of criminal history).

In *United States v. Jones*, the Court of Appeals for the Second Circuit affirmed a significant downward variance where the sentencing judge based a Guidelines variance on the defendant's work ethic, support of his family, attempts to go to college, positive adjustment to state probation, and the possibility of a much higher sentence if the defendant violated the terms of his supervised release. 460 F.3d 194, 194, 198 (2d Cir. 2006).[1]

In reaching its decision, the district court in *Jones* rejected the government's argument that there did not exist grounds for a variance, and held:

> [S]everal of the reasons relied upon, notably the Defendant's education, emotional condition, favorable employment record, family support, and good record on state probation are factors that the Sentencing Commission has concluded are "ordinarily" not relevant "in determining whether a departure is warranted." (citing U.S.S.G. §§ 5H1.2 (education); 5H1.3 (emotional condition); 5H1.5 (employment record); 5H1.6 (family ties); 5H1.11 (prior good works)). By citing the Guidelines' departure standards, however, the Government fails to appreciate that Jones's post-*Booker* sentence is not a Guidelines departure; it is a non-Guidelines sentence. (citation omitted) With the entire Guidelines scheme rendered advisory by the Supreme Court's decision in *Booker*, the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves.

*Jones*, 460 F.3d at 194.

Thus, under the post-*Booker* regime, a sentence of probation can be justified with proper consideration of the § 3553(a) factors, even if the Guidelines do not provide for probation in a particular case. *See Gall*, 552 U.S. at 59-60 (affirming sentence of 36 months probation where Guidelines sentence range was 30 to 37 months imprisonment); *see also United States v. Moore*,

---

[1]*See also United States v. Ruff*, 535 F.3d 999, 1001 (9th Cir. 2008) (affirming a below Guidelines sentence where the sentencing judge based variance on defendant's strong employment history, cooperation and remorse, support from his siblings, the absence of risk to the public, the appropriateness of restitution, and mental health and gambling issues); *United States v. Martin*, 520 F.3d 87, 93, 95-96 (1st Cir. 2008) (affirming substantial downward variance from Guidelines sentence range where sentencing judge "found that the defendant's family was unusually supportive; that the sincerity of his remorse, together with his character and personality traits, indicated a capacity for rehabilitation not frequently seen in recidivist defendants; [and] that he had 'demonstrated an unusually strong commitment to a law-abiding life,'" stating that "a district court may take idiosyncratic family circumstances into account, at least to some extent, in fashioning a variant sentence"); *United States v. Smith*, 103 A.F.T.R. 2d 2009-735, 737-39 (N.D. Ohio 2009) (issuing a below Guidelines sentence, justified by factors such as defendant's character, work ethic, charitable work in the community, and lack of criminal history).

104 A.F.T.R. 2d 2009-6358, 6360 (3d Cir. 2009) (affirming sentence of 5 years probation in tax evasion case where Guidelines sentence range was 18 to 24 months imprisonment); *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (affirming sentence of 5 years probation in false tax return case where Guidelines sentence range was 10 to 16 months imprisonment).

It is noteworthy that in *Gall*, both the district court and the Supreme Court noted that a sentence of probation carries with it a substantial restriction of freedom, as probationers are typically subject to many conditions and restrictions. *Gall*, 552 U.S. at 44, 48-49. As a result, probation should not be viewed as a lenient sentence.

The Fifth Circuit Court of Appeals has recognized that probation may be appropriate even though the Guidelines would dictate a substantial period of incarceration. In *United States v. Duhon*, 541 F.3d 391, 394-95 (5th Cir. 2008), the Court of Appeals for the Fifth Circuit affirmed a sentence of 60 months probation where the Guidelines sentence range was 27 to 33 months.[2] In *Duhon*, the district court properly considered the following factors in reaching its decision to issue a sentence of probation: 1) the defendant's lack of criminal history, 2) the fact that there was no indication that the defendant was a threat to the public, 3) that the defendant would benefit from continuing treatment with his psychologist, and 4) that imprisonment would cause the defendant to lose his Social Security benefits. *Duhon*, 541 F.3d at 395.

Finally, in a case with facts very similar to those here, the Third Circuit Court of Appeals affirmed a sentence of probation in a tax case because of the defendant's character and good works, in spite of a significant Guidelines calculation. In *United States v. Tomko*, the Third Circuit affirmed a sentence of 3 years probation for tax evasion (the first year of which was to be

---

[2]*See also United States v. Rowan*, 530 F.3d 379, 380 (5th Cir. 2008) (affirming sentence of 60 months probation where Guidelines sentence range was 46 to 57 months imprisonment).

served under home confinement), alcohol treatment, and 250 hours of community service where the guidelines sentence range was 12 to 18 months. 562 F.3d 558, 561, 563 (3d Cir. 2009).

Similar to this case, the defendant in *Tomko* owned a construction company. The defendant proposed working for Habitat for Humanity as a condition of his probation as a way to take advantage of his construction skills. *Id.* at 561. The defendant requested probation on the following basis:

> 1) his incarceration could cause Tomko, Inc.'s innocent employees to lose their jobs; 2) he has performed exceptional charitable acts and good works; 3) he has demonstrated an extraordinary degree of acceptance of responsibility; and 4) a combination of these three factors. As exhibits, Tomko attached over fifty letters from family, friends, community leaders, and others attesting to his pre-indictment charitable activities and other good works.

*Id.* at 562. The district court based its decision on the fact that the offense was not violent, it was not part of a larger criminal pattern, there were no identifiable victims, the defendant had no significant criminal history, he was involved in "exceptional charitable work and community activity," and he accepted responsibility for the offense. *Id.* at 562-63.

It should be noted that the United States Sentencing Commission recently submitted to Congress its proposed amendments, which if passed, would go into effect in November, 2010. One of the results of the amendments will be to expand the district court's ability to impose sentences that include alternatives to incarceration, such as probation. *See* AMENDMENTS TO THE SENTENCING GUIDELINES, POLICY STATEMENTS, AND OFFICIAL COMMENTARY, 75 Fed. Reg. at 27388.

## II. THE OFFENSE

During the tax years at issue (2003, 2004, and 2005), Mr. Pogue owned Paul Pogue, L.P., a commercial construction company. Paul Pogue, L.P. did business as Pogue Construction. Paul Pogue, L.P. files a Form 1120S tax return. During the years at issue, the net income from Paul

Pogue, L.P. flowed through to Mr. Pogue's Form 1040 individual tax return. Mr. Pogue has pled guilty to one count of making and subscribing a false tax return under 26 U.S.C. §7206(1). Mr. Pogue paid taxes to the IRS for tax years 2003, 2004, and 2005 in amounts totaling approximately $3,470,786.00. However, as indicated in the Factual Statement, Mr. Pogue admits to making and subscribing false Form 1040 tax returns for tax years 2003, 2004, and 2005, with a total tax loss to the Internal Revenue Service of $473,680.53. Mr. Pogue made deposits of $1,500,000 with the IRS for these three tax years, which have been computed to exceed the amount of restitution and all interest and penalties on the restitution amount.

## III. PAUL POGUE'S PERSONAL HISTORY AND CHARACTERISTICS

Paul Pogue's life, up until this conviction, was the quintessential rags to riches story. His mother settled in Dallas as a young girl, after travelling with her family from their native Arkansas in a horse drawn wagon. When Mr. Pogue, the youngest of her nine children was born in 1948, she and her husband and children moved from their one bedroom house to a two bedroom house that Mr. Pogue's father built from scraps. The older children were frequently pulled out of school to pick cotton, living in tents and away from home for weeks at a time. The younger children helped with the family's crops at home. By the time Mr. Pogue was 7-years-old, he had lost his father to a heart attack, and two siblings — one year old Veay to pneumonia, and 12-year-old Melba to a brain tumor. Mr. Pogue's mother remarried when he was 9-years-old and the family moved to their first home with indoor plumbing. Mr. Pogue credits his mother's deep religious faith with getting the family through those difficult times.

Mr. Pogue was one of only two of the Pogue children who completed high school. Following his graduation in 1967, he began his career in construction, working as a laborer for various local companies. He was already married and supporting a child when he suffered a

collapsed lung and could no longer work. Shortly after the birth of his second child, Mr. Pogue learned that his wife was unfaithful and the couple separated and ended their three year marriage. Unable to work in construction while he was recuperating, Mr. Pogue applied for a position with Household Finance. He was hired as a trainee at $450 a month and was sent to work in Big Springs, Texas. Mr. Pogue describes the time following his divorce as the "darkest period of his life." He drew on the strong faith he was raised with and sought counsel from a local minister who helped him realize his mission to help others. From that time on, things started to come together for Mr. Pogue. He was transferred to Sherman, Texas, close enough to Dallas so that he could see his children and his family frequently. He joined a church and volunteered with youth programs and met and married his wife. At that time they could not afford a honeymoon.

Paul and Judy Pogue celebrated their 35th wedding anniversary this past weekend. The family is exceptionally close – Paul and Judy's children, Brandon (31) and Paul (29) and Paul's son Randall (39) and their wives and children all live near one another and socialize on a regular basis. Mr. Pogue's mission of helping others has become a family affair. Mrs. Pogue frequently accompanies her husband when he visits churches, clinics and orphanages in India, Mexico and Nicaragua that he was instrumental in building. Mr. Pogue's sons likewise frequently accompany their father on these humanitarian relief trips. What sets Mr. Pogue apart is his level of commitment and personal involvement.

In the main lobby of the building that houses Pogue Construction, a large photograph of the extended Pogue family — Paul, Judy, Randall, Brandon and Ben and their wives and Paul and Judy's eight grandchildren (a ninth grandchild was born last week) — rests on an easel. (Picture attached as Exhibit "C.") It is a reminder to all who enter the building of the importance of family and an insight into the priorities of Paul Pogue, a man who worked hard to build a

successful business and made a lifetime career out of using his time, skills and good fortune to help others in need.

### A) Pogue's Long History of Charitable Acts and Good Works

For over 25 years, Paul Pogue has given unselfishly of his time and efforts to help others. His organized charitable works include his labor and skills to build clinics, hospitals and orphanages in Mexico, India, Nicaragua and Africa. When his business flourished, Mr. Pogue was able to fund many of these projects on his own or with others, but no matter how busy he was with work, or how generous he was with his financial donations, Mr. Pogue continued to devote his time and labor to these projects. Of equal importance, he also inspired many others to follow his example.

On a more micro level, Mr. Pogue facilitated the cleft palate surgery for a Mexican child, Nabor, by flying the child to Louisiana for a series of surgeries by a leading specialist in cleft palate surgery (*See* pictures of Mr. Pogue with Nabor, Exhibit "E"). He also has assisted numerous children and young adults by helping them to continue their education both here in the United States and abroad.

In his letter to the Court, State Representative and attorney Ken Paxton expressed a commonly held sentiment about Paul Pogue' level of selflessness:

> Not only is Paul involved in the community on a macro level, he is also a man who is involved in the lives of people in his community on an individual level. I have often seen Paul mentoring young men who are positively influenced by his charismatic leadership and encouraged by his willingness to help them. Paul is truly an enjoyable person to be around. He is humorous and easy going. He cares about people and invests in those who ask for his guidance and assistance.

Similarly, Mark David, a long time friend of Mr. Pogue's, writes:

> ...I have done my best to pattern my own charitable actions after Paul's, but the bar is so high I only admire it and be thankful that he is present in our community.

> Paul follows up financial donations with a tremendous personal involvement with his time and resources. Construction services, flights, etc. are given freely and accompanied by days and weeks of his own time. I don't say this lightly: I know of no one who is employed in the private sector who gives so much in time and gifts to the non-profit charitable world.

As the details of Mr. Pogue's charitable acts and good works are too numerous and extensive to describe in this memo, a comprehensive list is contained in Appendix 1 – Exhibit "A." The following is just a sampling of Mr. Pogue's charitable works:

- **Children's Wing at First Baptist Church, McKinney:** Mr. Pogue obtained city permits and oversaw the construction of the new Children's Wing.

- **Christ for India:** For over 20 years, Mr. Pogue has supported this organization. He has traveled to India countless times and personally helped build an orphanage, school and hospital in southern India. He has served as a board member for over ten years. *See* letter from Mr. Jameson Titus and pictures at Exhibit "D.".

- **Mexico Ministries:** Over the last 25 years, Mr. Pogue has personally assisted in building and supporting churches, clinics, a hospital, and orphanage in Chiapas, Mexico. He personally recruited volunteers and took teams of men to Mexico for these construction projects. Mr. Pogue has personally assisted in building between 70 and 80 churches in Mexico. *See* letter from Larry Meyers, and pictures of churches, Medical Clinic and orphanage in Chiapas at Exhibit "E."

- **Mundo De Fe (World of Faith), the Hispanic Ministry of Covenant Church:** Mr. Pogue made 14 trips to Nicaragua *in one year* to design and build a church, and 4 additional trips to remodel an orphanage. He took teams of men to assist in the different projects from the ground up. He paid for the supplies and materials, and donated a tractor and school bus for the orphanage. *See* letter from Ralph Holland and pictures of his work at Exhibit "F."

- **African Missions:** Mr. Pogue, for over a decade, has been instrumental in building churches and caring for orphans and others in Africa. He devoted extensive time and resources to provide pre–K education to children in Kenya. *See* letter from Fred and Mary Posey and pictures at Exhibit "G."

- **Grace Flight:** (formerly Angel Flight) – Mr. Pogue, along with many other dedicated pilots, volunteers his plane, fuel, time, and expertise to ferry patients to hospitals and treatment centers when they can't afford to get there on their own. In February 2010, Pogue and one of his sons undertook their first overseas mission for Grace Flight, by flying a medical team and supplies into earthquake devastated Haiti. *See* Letter from Butch Smith and pictures of a recent Grace Flight to Haiti at Exhibit "H."

- **Military Ministry in Williamsburg, VA:** (An organization that assists soldiers returning from war zones.) Mr. Pogue paid for the mother of a soldier killed in Iraq to travel to Germany to meet her son's friends. Upon her return, he helped her start the ministry, When Your Doorbell Rings, which provides counsel and comfort to families who have lost loved ones in war.

In addition to the specific examples outlined above, Mr. Pogue respectfully requests that the Court review the list of his endeavors at Appendix 1 – Exhibits "A" and "B" and the letters on his behalf at Exhibit "K."

**B) Paul Pogue's Professional History**

Mr. Pogue started his career in construction mixing and pouring concrete and performing other hard labor jobs. In 1979, after several years of working for a finance company, he returned to construction and partnered with a friend to start a small residential construction business. Five years later, Mr. Pogue bought out his partner and started Pogue Construction. It was several years of hard work before the business began to make a profit and build capital so that it could compete for commercial jobs. The business really began to prosper when Mr. Pogue moved to McKinney in 1991. Eventually, Pogue Construction grew to employ nearly 100 people and become one of the area's leading builders and a preferred contractor to local school districts, because of the company's excellent reputation for honesty, integrity and quality work.

Scott Unclebach, a former employee for ten years and protégé of Mr. Pogue's attributes the company's success to Paul Pogue's outstanding reputation. In his letter to the Court he writes:

> ...Speaking from someone who has been in the industry and a competitor for many years, he deals with owners and subcontractors in a manner that is not often seen in this tough business. Paul has proven over the last 30 years that he not only deals honestly and fairly, but will sacrifice when necessary for others. It would be impossible to grow a business in our market to the size he has without dealing fairly and delivering great projects. The construction industry is a small world and word gets out quickly if you do not handle your business with integrity. I can tell you that I have never heard one derogatory word spoken against Paul or his company, pretty amazing!

Richard Abernathy, an attorney who has represented Pogue Construction for a number of years, similarly writes:

> My own assessment of Paul's character has been confirmed by others in my work as a lawyer. My firm represents twenty six school districts and four Community Colleges, many of whom do business with Pogue Construction. Clients on numerous occasions have commented on the quality of work performed by the company. But when a problem arose, my clients reported that Paul personally assured the client that the company would not abandon the client, making necessary repairs or fixes although the problem may not be the responsibility of Pogue Construction and often at great expense to Pogue Construction.

## IV. PRESENTENCE REPORT

The Presentence Report ("PSR") indicates a Criminal History Category of I, a Total Offense Level of 17, a Sentencing Guideline Range of 24 to 30 months, and a Sentencing Guideline Range in Zone D of the Sentencing Table. The PSR indicates restitution in the amount of $473,680.53, and a fine range of $5,000 to $947,361.06.

## V. FACTORS UNDER 18 U.S.C. §3553(A)

As established below, consideration of the factors outlined in 18 U.S.C. § 3553(a) demonstrate that a sentence of probation is appropriate for Mr. Pogue. These seven factors are (1) the nature and circumstance of the offense and the history and characteristics of the defendant, (2) the need for the sentence imposed, (3) the kinds of sentences available, (4) the Sentencing Guidelines, (5) the Guidelines' policy statements, (6) disparity with similar

offenders, and (7) the need to provide restitution to the victims of the offense. 18 U.S.C. §3553(a).

### 1. Nature of the Offense and History and Characteristics of the Defendant

Post – *Booker*, there is "[n]o limitation…on the information concerning the background, character, and conduct of a [defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. §3661. With respect to this sentencing factor, one judge noted:

> . . . if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (sentencing order), *aff'd*, 301 Fed.Appx. 93 (2d Cir. 2008).

#### (a) History and Characteristics of Mr. Pogue

As previously discussed, the Court has been provided with letters from Pogue's family, business associates, employees, community leaders, and friends. Those letters, and the charitable acts as outlined in Exhibits "A" and "B," speak in glowing terms and provide specific examples of Pogue's character, charitable activities (particularly in the areas of personally assisting children in need around the world), his role as a civic leader, and as a generous philanthropist. A number of these letters not only describe Paul Pogue's good deeds, but speak of how he has inspired others by his example.

Equally impressive are the heartfelt expressions in recognition of his role as a devoted husband, caring parent, and loyal friend.

Furthermore, Pogue Construction could potentially suffer if Mr. Pogue were to be sentenced to imprisonment. Pogue Construction is currently led by Ben Pogue, Paul Pogue's 30 year old son. Mr. Pogue remains in a consulting capacity with the company. Ben Pogue relies heavily on his father's counsel and business relationships to keep Pogue Construction successful during these difficult economic times. In his letter to the Court, Exhibit"K" he explains:

> We depend on my dad's knowledge of the business, and his relationships that he has built over the past 31 years... As with most solid relationships, those relationships are not built overnight nor are they transferred promptly. My father is essential to mentoring those relationships so that Pogue Construction can continue working with them.
>
> I am 30 years old running a company with an average annual revenue of three hundred million dollars. I am primed and trained to do my job, however, with limited knowledge of not only the industry but life experiences that are essential to running a company this size. Not only is my dad the former CEO and owner, but he is my father who will always be a source of wisdom and council for all major company decisions.

Since Paul Pogue would be prohibited from doing business from prison, imprisoning Paul Pogue could put Pogue Construction in peril. The business could lose clients and lines of credit if Mr. Pogue is not available to assist his son. Pogue Construction employs approximately 100 people whose jobs and families could be affected.

**(b) Nature of the Offense**

Mr. Pogue has pled guilty, accepted responsibility and does not challenge his conviction or the seriousness of the charge. He knows that he is responsible for his own actions and that his actions were unlawful. It should be noted, however, that the offense involved here is nonviolent and Mr. Pogue has no prior criminal history.

**2. The Need for the Sentence Imposed**

The purposes of sentencing—retribution, general deterrence, specific deterrence, and rehabilitation—justify a sentence of probation. *See* 18 U.S.C. § 3553(a)(2).

**(a) Retribution**

Under 18 U.S.C. § 3553(a)(2), the sentence imposed must reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. Mr. Pogue is now a convicted felon. For someone of Mr. Pogue's stature in his community, Mr. Pogue's conviction alone is substantial punishment, as his reputation will be forever tarnished. Furthermore, the stress and embarrassment of undergoing a criminal investigation has already taken a toll on Mr. Pogue. Finally, as discussed above, probation should not be considered a lenient sentence, as it carries with it substantial restrictions on liberty. Retribution will be adequately served via a sentence of probation along with rigorous community service.

**(b) General Deterrence**

General deterrence aims to deter others from crime. Even a probated sentence can have a strong deterrent effect on prospective offenders. In tax crimes, it is the ardent enforcement of the tax laws by prosecutors that really deters tax criminals from offending. *See Gardellini*, 545 F.3d at 1091. In this case, general deterrence will be served just as well through probation as it would through incarceration.

**(c) Specific Deterrence and Rehabilitation**

Specific deterrence and rehabilitation aim to prevent the individual from committing further offenses. Specific deterrence and rehabilitation are not justifications for incarceration in this case. Imprisonment is not needed to protect society from Mr. Pogue. The consequences and stigma of being a convicted felon for committing a tax crime is a severe punishment for Mr. Pogue. Similarly, the recent criminal investigation and plea is not an experience Mr. Pogue will ever repeat. Mr. Pogue does not have any specific rehabilitative needs that would be best served

by imprisonment. Mr. Pogue is an otherwise law abiding citizen who, after this case, will have no inclination to break the law.

### 3. The Kinds of Sentences Available

The Court may consider a wide range of alternatives to imprisonment to fashion a just sentence, including probation and community service. Section 3553(a)(3) "directs the judge to consider sentences other than imprisonment." *Gall*, 552 U.S. at 59.

### 4. & 5. The Sentencing Guidelines and Policy Statements

The PSR determined an offense level under the advisory guidelines of 17. Offense level 17 corresponds to a sentence of 24 to 30 months. Pogue respectfully submits, however, that a sentence within the PSR's guidelines range is not reasonable in this case because it would be greater than necessary to accomplish the purposes of sentencing pursuant to §3553(a)(2).

In considering the Guidelines, Mr. Pogue should qualify for guideline downward departures under U.S.S.G. §§5H1.2 (vocational skills), 5H1.5 (employment record), 5H1.6 (family and community ties), and 5H1.11 (prior good works) for the reasons previously discussed as justifications for variance under §3553(a). Any argument that the use of guidelines departures is mandatorily limited by the guidelines' policy statements is contrary to *Booker* and must be rejected. *See Jones*, 460 F.3d at 194.

Even under pre-*Booker* jurisprudence, evidence of civic, charitable and good works could serve as grounds for a departure under §5K2.0(a)(4) if they were present to an exceptional degree. For example, in *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005), the Court held that a four-level downward departure for "good works" was warranted given the defendant's history of organizing and running youth sports programs in a depressed area. In *Cooper*, the defendant was sentenced for securities fraud and filing a false tax return. *Id.* at 173. The Court

found that the defendant did not simply donate money to charity; instead, he was personally involved in the good works that he performed. *Id.* at 176-77. Here, Mr. Pogue does not merely donate money to charities. He invests all of his sweat, talents and treasures to works around the world.

Courts have regularly held that charitable activities and community service can justify a downward departure. For example, in *United States v. Serafini,* 233 F.3d 758, 773-74 (3d Cir. 2000), the Court held that a defendant's charitable activities and community service justified a three-level downward departure. In *Serafini,* the Court noted that a downward departure was warranted based on the exceptional amount of time that the defendant devoted to his community and charitable activities. *Id.* at 775.

Finally, in *United States v. Greene,* 249 F. Supp. 2d 262 (S.D.N.Y. 2003), the defendant pled guilty to thirteen counts of aiding and abetting in the preparation of false income tax returns. The Court held the defendant was entitled to a seven-level downward departure based on his charitable work, community service and extraordinary family circumstances. As a result, the Court ordered a sentence of probation. *Id.*

These cases highlight the importance of a defendant's commitment of time and physical efforts, not simply financial contributions. *Id.* at 264. Mr. Pogue's charitable contributions and good works, while very significant financially, also involved physical hands–on work in remote and primitive conditions. These types of exceptional personal charitable contributions were grounds for a downward departure under pre-*Booker* jurisprudence, and under post-*Booker* jurisprudence are grounds for a variance under 18 U.S.C. §3553(a).

Upon reviewing Mr. Pogue's charitable and good works *in globo,* we respectfully submit that a sentence of probation is appropriate and will adequately reflect the purpose of sentencing.

*See United States v. Tomko*, 562 F.3d 558, 561, 563 (3d Cir. 2009) (holding that a guilty plea of income tax evasion warranted a sentence of home confinement/probation, community service, a fine of $250,000, and in-house alcohol abuse treatment); *United States v. Moore*, 104 A.F.T.R. 2d 2009-6358, 6360 (3d Cir. 2009) (affirming sentence of 5 years probation in tax evasion case where Guidelines sentence range was 18 to 24 months imprisonment); *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (affirming sentence of 5 years probation in false tax return case where Guidelines sentence range was 10 to 16 months imprisonment); *United States v. Duhon*, 541 F.3d 391, 394-95 (5th Cir. 2008) (affirmed a sentence of 60 months probation in a possession of child pornography case where the Guidelines sentence range was 27 to 33 months of imprisonment); *United States v. Rowan*, 530 F.3d 379, 380 (5th Cir. 2008) (affirming sentence of 60 months probation in a possession of child pornography case where Guidelines sentence range was 46 to 57 months imprisonment).

**6. Disparity with Similar Offenders**

A downward variance from the Guidelines sentence range would not create disparity with similar offenders. Among tax offenders sentenced under the Guidelines in 2009, a full 41.7% received sentences below the Guidelines range. U.S. Sentencing Commission Final Quarterly Data Report, Fiscal Year 2009, attached hereto as Exhibit "J," at 9. Only 37.7% of tax offenders were sentenced within the Guidelines range in 2009, only 0.8% received sentences above the Guidelines range, and the remainder received some type of government sponsored assistance in sentencing. *Id.* at 8-9.

Furthermore, a sentence of probation would not create disparity with similar offenders. In 2009, 18.7% of tax offenders received probation-only sentences, and 38% of tax offenders received probation as part of their sentences, in some cases combined with "confinement" (but

not imprisonment). *Id.* at 30. Only 62% of tax offenders sentenced under the guidelines in 2009 received imprisonment as part of their sentences. *Id.* Thus, a probation-only sentence in Mr. Pogue's case will not create disparity with similar offenders.

**7. Restitution**

As indicated in the Plea Agreement, the tax loss amount in this case is $473,680.53. *See* Plea Agreement at 4. On September 28, 2007, Mr. Pogue paid $1,000,000 to the Internal Revenue Service to be applied to tax years 2003, 2004, and 2005. Furthermore, Mr. Pogue paid an additional $500,000 on May 16, 2008. *See* Exhibit "I." These amounts are computed to be sufficient to satisfy any resulting interest and penalties on the restitution amount.

## VI. SENTENCING RECOMMENDATIONS

**A) Community Service**

Section 3553(a) directs that a sentencing court must impose a sentence that is fair in light of the offense, affords adequate general and specific deterrence to criminal conduct, and provides the defendant with any training or treatment that may be necessary. *See* 18 U.S.C. § 3553(a)(2). As discussed above, a sentence of probation combined with rigorous and demanding community service will be sufficient to further all of the goals Congress set forth in 18 U.S.C. § 3553(a)(2). Paul Pogue is an ideal candidate for community service. He is a first-time offender, he has no history of violence, and he is uniquely positioned to provide valuable community service to his community. A rigorous and appropriately structured community service program for Mr. Pogue can serve the needs of justice in this case, by taking Mr. Pogue's time and talent and putting them to use in a constructive and positive manner.

The ever increasing endorsement of community service by both federal and state courts can be attributed to individual judges who recognize that it ". . . is a burdensome penalty that

meets with widespread public approval, is inexpensive to administer . . . produces public value . . . and . . . can to a significant extent be scaled to the seriousness of crimes." MICHAEL TONRY, INTERMEDIATE SANCTIONS IN SENTENCING GUIDELINES 11, Nat'l Inst. Of Justice (1997), *available at* http://www.ncjrs.gov/pdffiles/165043.pdf.

A 2005 publication of the Administrative Office of the United States Courts described community service as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair—a 'win-win' proposition for everyone involved." OFFICE OF PROB. AND PRETRIAL SERVICES, ADMIN. OFFICE OF THE U.S. COURT, COURT & COMMUNITY: AN INFORMATION SERIES ABOUT U.S. PROBATION & PRETRIAL SERVICES: COMMUNITY SERVICE (2005), http://www.uscourts.gov/misc/revision-community.pdf.

The United States Sentencing Commission recently submitted to Congress its proposed amendments, which if passed, would go into effect in November, 2010. One of the amendments will expand a judge's ability to order alternatives to incarceration. In its official submission to Congress, the Sentencing Commission explained:

> The amendment is a result of the Commission's continued multi-year study of alternatives to incarceration. The Commission initiated this study in recognition of increased interest in alternatives to incarceration by all three branches of government and renewed public debate about the size of the federal prison population and the need for greater availability of alternatives to incarceration for certain nonviolent first offenders.

AMENDMENTS TO THE SENTENCING GUIDELINES, POLICY STATEMENTS, AND OFFICIAL COMMENTARY, 75 Fed. Reg. 27388, 27394 (proposed Apr. 30, 2010) (to be codified at U.S.S.G. § 5B1.1 nn.1(b) and 2; U.S.S.G. § 5C1.1 n.3), *available at* www.ussc.gov/FEDREG/20100511_Federal_Register_Notice.pdf.

For the Court's consideration, a Community Service Proposal has been developed that would utilize some of Mr. Pogue's most distinctive talents: his strong work ethic, his

construction and business management skills, and his history of direct involvement in projects that benefit those in need. *See* Appendix 2: Community Service Proposal for Paul Pogue.

**B) Home Confinement**

If the Court determines that a sanction in addition to community service is warranted, we ask the Court to consider imposing a term of home confinement. Such a sanction would allow Mr. Pogue to continue to volunteer his time, while otherwise limiting his freedom. Home confinement is defined by the United States Sentencing Guidelines as:

> A program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office. When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, educational or training programs, and such other times as may be specifically authorized.[3]

Home confinement in the Federal system "ranges from a simple nighttime curfew to a 24-hour-a-day 'lock-down' home incarceration."[4] The extent to which individuals are permitted to leave their residence is determined on a case-by-case basis, depending on the goals of supervision and the orders of the court.[5] If the Court determines that the "amenities available in the residence of a defendant would cause home detention not to be sufficiently punitive," it is permitted to "limit the amenities available."[6]

Over the past two decades, home confinement has gained acceptance in the Federal criminal justice community as a credible sanction and alternative to incarceration.[7] Judges have imposed home confinement more frequently as they have "learned more about what it offers" and

[3] U.S.S.G. §5F1.2, Application Note 1.
[4] Darren Gowen, "Overview of the Federal Home Confinement Program," *Federal Probation*, Page 11 (December 2000).
[5] *Id.*
[6] U.S.S.G. §5F1.2, Application Note 2.
[7] Gowen at 12.

discovered its cost effectiveness.[8] Only recently has research begun to examine the effectiveness of community based sanctions such as home detention. In 2000, Robert Stanz and Richard Tewksbury evaluated the Jefferson County Home Incarceration Program in Kentucky.[9] The authors conducted a five year follow up study of 2,649 offenders who had participated in the program in 1990. While the majority of offenders (85%) successfully completed the program, several factors were found to increase the likelihood of success. For example, those offenders who were older, serving longer sentences, and came from less crime-ridden neighborhoods were more likely to successfully complete the period of supervision. In addition, research has found that offenders who are under electronic monitoring are less likely to commit new offenses than comparable offenders under different forms of supervision.[10]

Neither defense counsel nor Mr. Pogue seeks in any way to diminish the gravity of the instant offense. A sentence of supervised probation conditioned upon community service and home confinement will satisfy the goals of sentencing as defined in 18 U.S.C. §3553(a).

## VII. <u>CONCLUSION</u>

For the reasons set forth above, Mr. Pogue respectfully requests this Court impose a sentence of probation with community service as a condition of his probation.

---

[8] Id. at 11.

[9] Stanz, R. and R. Tewksbury (2000). Predictors of success and recidivism in a home incarceration program. *The Prison Journal* 80: 326-344.

[10] See also Bonta, J., S. Wallace-Capretta and J. Rooney (2000). A quasi-experimental evaluation of an intensive rehabilitation supervision program. *Criminal Justice and Behavior* 27: 312-330; Courtright, K., B.L. Berg and R. Mutchnick (1997). The cost effectiveness of using house arrest with electronic monitoring for drunk drivers. *Federal Probation* 61:19-22; Courtright, K., B.L. Berg and R. Mutchnick (2000). Rehabilitation in the new machine? *International Journal of Offender Therapy and Comparative Criminology* 44: 293-311.

Respectfully submitted,

By: ______________________________
Michael E. McCue
State Bar No. 13494150
Michael A. Villa, Jr.
State Bar No. 24051475
Stephanie D. Mongiello
State Bar No. 24058814
**MEADOWS, COLLIER, REED,**
**COUSINS, CROUCH & UNGERMAN, L.L.P.**
901 Main Street, Suite 3700
Dallas, Texas 75202-3792
(214) 744-3700
(214) 747-3732 (Fax)

ATTORNEYS FOR DEFENDANT
PAUL POGUE

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendant's Sentencing Memorandum has been served on this 24th day of August 2010 as follows:

J. Andrew Williams
Assistant U.S. Attorney
U.S. Attorney's Office, Eastern District
101 E. Park Blvd., Suite 500
Plano, Texas 75074

**BY HAND DELIVERY**

Daisy Pridgen
U.S. ProbationOffice
224 William M. Steger Federal Bldg
211 West Ferguson Street
Tyler, TX 75702

**BY FEDERAL EXPRESS**

______________________________
MICHAEL E. McCUE